IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

FT. LAUDERDALE DIVISION

CASE NO. 17-cv-61125-COOKE/GOODMAN

TRUDY REYNOLDS, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

USHEALTH GROUP, INC., a Delaware corporation, USHEALTH ADVISORS, LLC, a Texas limited liability company, MICHAEL SMOOT, individually, FLOYD T. HERNDON, individually, and DONALD DENTE, individually,

Defendants.

_________________________________________

VIDEOTAPED DEPOSITION OF

MICHAEL SMOOT

Taken on Behalf of the Plaintiff

DATE TAKEN: Monday, November 6, 2017
TIME: 12:56 p.m. - 8:03 p.m.
PLACE: 600 Brickell Avenue
Suite 3600
Miami, Florida 33131

Examination of the witness taken before:

Beatriz Valdes-Prieto, FPR
Veritext Legal Solutions
One Biscayne Tower
2 South Biscayne Boulevard - Suite 2250
Miami, Florida 33130

APPEARANCES

On behalf of the Plaintiff:

MATTHEW P. MCCUE, ESQ.
The Law Office of Matthew P. McCue
1 South Avenue
Suite 3
Natick, Massachusetts 01760

On Behalf of USHealth Advisors, LLC:

JEFFREY A. BACKMAN, ESQ.
Greenspoon Marder, P.A.
200 East Broward Boulevard
Suite 1800
Fort Lauderdale, FL 33301

On Behalf of Floyd T. Herndon:

SCOTT W. ATHERTON, ESQ.
Atherton McAuliffe & Reeder, P.A.
224 Datura Street
Suite 815
West Palm Beach, FL 33401

On Behalf of Donald Dente:

PETER S. BAUMBERGER, ESQ.
Kubicki Draper
25 West Flagler Street
Penthouse
Miami, FL 33130

Also Present:

Doug Frey, Videographer
Floyd T. Herndon
James Jackson, Esq.

# I N D E X

Witness

Michael Smoot

(Direct Examination by Mr. McCue) 7
(Cross-Examination by Mr. Atherton) 183
(Cross-Examination by Mr. Baumberger) 326
(Cross-Examination by Mr. Backman) 333
(Redirect Examination by Mr. McCue) 342

Certificate of Oath 346
Reporter's Certificate 347
Read Letter 348
Errata Sheet 349

E X H I B I T   I N D E X


| Plaintiff's | Description | Page No. |
|---|---|---|
| Exhibit 1 | Notice of Deposition | 7 |
| Exhibit 2 | Documents Produced by Mike Smoot on 11-2-17 | 76 |
| Exhibit 3 | Message Dated 11-27-2015 | 97 |
| Exhibit 4 | Documents Bates Nos. PLFF-000035 - 000041 | 110 |
| Exhibit 5 | E-mail Dated 10-29-15 with Attachments | 116 |
| Exhibit 6 | Various E-mails | 116 |
| Exhibit 7 | E-mail Dated 11-21-2016 | 145 |
| Exhibit 8 | E-mail Dated 6-6-2015 | 146 |
| Exhibit 9 | USHealth Advisors Agent Agreement | 157 |
| Exhibit 10 | Document Bates No. Reynolds USHA000060-86 | 159 |
| Exhibit 11 | Memo Dated 6-26-2012 | 161 |
| Exhibit 12 | Memo Dated 11-1-2003 | 162 |
| Exhibit 13 | E-mail Dated 5-7-205 with Attachments | 163 |

E X H I B I T   I N D E X


| Defendants' | Description | Page No. |
|---|---|---|
| Exhibit 14 | Articles of Organization | 203 |
| Exhibit 15 | Certificate of Dissolution | 215 |
| Exhibit 16 | Various E-mails | 217 |
| Exhibit 17 | E-mail Dated 5-7-2015 with Attachment | 222 |
| Exhibit 18 | E-mail Dated 5-7-2015 Bates No. Herndon 089 | 235 |
| Exhibit 19 | E-mail Dated 10-29-2015 with Attachment Bates No. USHEALTH 00001 - 00005 | 247 |
| Exhibit 20 | Text Messages Bates No. Herndon 000062 | 261 |
| Exhibit 21 | USHealth Advisors, LLC's First Set of Interrogatories to Plaintiff | 291 |
| Exhibit 22 | E-mail Dated 1-19-2016 with Attachment | 302 |
| Exhibit 23 | Text Messages Bates No. Herndon 000073 | 322 |
| Exhibit 24 | Various Documents | 323 |
| Exhibit 25 | Copy of First Amended Class Action Complaint | 335 |

THE VIDEOGRAPHER: We are now on the record. The time is 12:56 p.m. Today's date is November 6th, 2017. This is the beginning of the video deposition of Michael Smoot. Taken in the matter of Trudy Reynolds, individually, and on behalf of others similarly situated versus USHealth Group, Inc., USHealth Advisors, LLC, Michael Smoot, Floyd T. Herndon and Donald Dente. Filed in the United States District Court for the Southern District of Florida, Fort Lauderdale Division, case number 17-CV-61125-Cooke/Goodman. This deposition is being held at 600 Brickell Ave., suite 3600, Miami, Florida 33131.

My name is Doug Frey. I'm with Veritext and I'm the videographer. The court reporter is Betty Prieto, also with Veritext.

Would counsel and all present please introduce yourselves for the record.

MR. MCCUE: Matthew McCue for the plaintiff.

MR. ATHERTON: Scott Atherton and Terry Mullen for Floyd T. Herndon.

MR. BAUMBERGER: Peter Baumberger for Don Dente.

MR. BACKMAN: Jeffrey Backman and also with

me is Jim Jackson for USHealth.

THE VIDEOGRAPHER: And would the court reporter please swear in our witness.

THE COURT REPORTER: Raise your right hand, sir.

Do you solemnly swear or affirm that the testimony you will give in this cause will be the truth, the whole truth and nothing but the truth?

THE WITNESS: I do.

WHEREUPON,

MICHAEL SMOOT,

acknowledged having been duly sworn to tell the truth and testified upon his oath as follows:

DIRECT EXAMINATION

BY MR. MCCUE:

Q. Mr. Smoot, good afternoon.

A. Good afternoon.

Q. I'm glad you came to Florida to get your depo done. We're going to start with your first exhibit, which is your depo notice.

MR. MCCUE: And counsel, I'll pass exhibits here, if you guys could pass them out.

(Thereupon, Notice of Deposition was received as Plaintiff's Exhibit 1 for Identification.)

Q. I just want you to confirm that that is your notice of taking deposition for today and that

have a business address?
A. No. I'm not -- I don't operate a business right now.
Q. Okay. What's your current employment?
A. I work for Wellington Security. Doing low voltage security installations and service.
Q. Okay. And do you work out of your home or is there a business address for Wellington?
A. There is a business address for Wellington. They dispatch me from home. I'm not sure what their --
Q. Okay. I understand. What is your understanding of what this lawsuit is about?
A. It's in reference to, I guess, calls that were made through software that -- that we used to generate leads --
Q. Okay.
A. -- for health care.
Q. And calls that your company made, called GSI; is that right?
A. That's correct, yes.
Q. And the calls that you made, were they -- were they made on be -- behalf of USHealth Advisors?
MR. BACKMAN: Object, form. Go ahead.
MR. BAUMBERGER: Join.

A. No.
MR. BACKMAN: We're going to do that on this side of the table every now and then.
THE WITNESS: Okay.
MR. BACKMAN: You're free to ask after we make our objection. Free to answer, I'm sorry.
A. So to be clear, I did not work directly with USHealth Advisors --
Q. Okay.
A. -- in any capacity. The leads that I generated were on behalf of Tim Herndon's agency to help his agents. Now, whether that was for -- I mean they worked in the health care world, but any direct contact with USHealth -- so to clarify --
Q. Right.
A. I couldn't say yes to that answer because of the fact that we did not work directly with them. We had no contact or no direct correspondence with them regarding any leads.
Q. I understand. The product that you were -- the goods or services that you were promoting --
A. Uh-hum.
Q. -- were they USHealth insurance policies?
MR. ATHERTON: Object to the form.
MR. BACKMAN: Object to form.

Maximum Security out of California. So I think -- I had -- at one time had contracts with those guys. Well, it's not hard to get a contract at all. All you've got to do is pick up the phone and call their dealer and say I want to be a sub-dealer, and they pretty much send you the contract. So, that's -- that's all I'm saying. I'm not saying -- I do know that eventually, as time went on, he did become an ADT dealer. How he marketed that, I don't know.

Q. Okay. Did GSI market home security?

A. Did GSI ever market home security? Not that I recall.

Q. Okay. If Mr. Mears was marketing home security by a prerecorded message, would he be using the GSI corporate structure?

A. Not the corporate structure, but he may have been using corporate resources.

Q. Are there any documents that you're aware of that reflect Mr. Mears using corporate resources to market home security?

A. At this moment in time, no.

Q. Okay. You and I have had several conversations in the past, correct?

A. Yes.

Q. In each of those conversations did you tell

me that you were exclusive to USHealth Advisors?
MR. ATHERTON: Object to the form.
MR. BAUMBERGER: Form.
A. I did -- I did, however, to follow up on that, that was prior to me going through my e-mails and actually reviewing a lot of the conversations and the things that had gone on multiple years ago.
Q. Have you produced any of those e-mails?
A. As of yet, no.
Q. Why?
A. Because I haven't finished looking. Let me put it that way. I haven't finished all of this stuff. Those e-mails I sent you was everything I could do within the time frame I had before coming out here.
Q. Have you had and conversations with any of the attorneys in this room about this apparent use of prerecorded marketing for home security purposes?
A. As far as have I had any conversations with any of these attorneys in this room? About --
Q. Let me rephrase.
A. Okay.
Q. We spoke about a month ago, correct?
A. Yes.
Q. On the phone. And you told me your

marketing was exclusive for USHealth?

A. Yes.

MR. ATHERTON: Object to the form.

Q. When did that change?

MR. ATHERTON: Object to the form.

MR. BACKMAN: Join.

MR. BAUMBERGER: Join.

A. It didn't change. What I'm saying to you is this: When I was involved, and as far as GSI is concerned, they were our only client. But in doing my research, looking through e-mails, I found those other e-mails that you have, the recordings as well, during the timeline of all of this going down. That is why I included it.

Q. So what you're referring to is one e-mail that has a recording that's titled "Home Security," correct?

MR. ATHERTON: Object to the form.

MR. BACKMAN: Object to form.

A. Yes. That would be the e-mail I'm referring to.

Q. Okay.

A. Absolutely.

Q. And that's the only e-mail you've produced that shows Mr. Mears essentially, without your

permission or authorization, using corporate resources of GSI to market home security?

MR. ATHERTON: Objection to the form.

MR. BACKMAN: Object to form.

MR. BAUMBERGER: Join.

A. As of now, yes.

Q. And you will be producing additional e-mails that show that?

A. I'm going to attempt to. I don't know for sure if they exist or not.

Q. Let me -- let me back up. You just told me that you realized this had happened because you just went through e-mails with Mr. Mears?

A. No. I told you I suspected it happened.

Q. Okay. Did it happen or not happen?

A. I believe it did.

Q. How do you know?

A. It's just knowing Cory. Knowing who he was and his state of mind at the time. He had to do something to make money. He had no resources to do anything other than to act upon and use those -- that software we had, the license was done at the end of the month. We were done. We couldn't do any more health care.

Q. The campaign in July of 2015, who did you

A. Yes. That is correct.
MR. ATHERTON: Object to the form.
Q. And, essentially, you were paid in May and June for work that you ended up doing in July; is that right?
MR. ATHERTON: Object to the form.
MR. BACKMAN: Object to the form.
A. Okay. So, we had -- I felt like we had an obligation, number 1, to deliver on what he had paid us for because we had not transferred enough leads to compensate for the amount that he had already paid us up to that point. Number 2, we were still holding on to hope that it was going to work and we going to be able to build a business off of it. So we -- we still, basically, owed Mr. Herndon those transfers.
Q. Okay. You signed a contract with USHealth Advisors in early July of 2015. Do you recall that?
A. Uh-hum.
Q. When you made these calls through GSI, were you making them in the capacity -- in your capacity as an agent for USHealth Advisors?
A. No.
MR. ATHERTON: Object to the form.
Q. When did you first receive any type of payment from USHealth Advisors?

MR. MCCUE: Objection.
A. Yes.
Q. Do you have any reason to believe that this e-mail is not a true and correct copy of the actual e-mail and attachment you sent to Mr. Herndon on Thursday, May 7th, 2015, communicating your company's proposal to him in connection with these double opt-in live transfers?
A. Yes. This is a document that I sent.
Q. All right. And does it appear to be true and correct?
A. Oh, yes.
Q. Does it appear to be complete?
A. Yes.
Q. Now, if we were to look at the proposal, in the -- in the header of the proposal, it says Proposal to USHealth Advisors/Tim Herndon Insurance Agency. Do you see that?
A. Yes.
Q. Now, was this a proposal for USHealth Advisors or for the Herndon agency or, you know, what -- what did you intend it to be or understand it to be?
A. Well, at the time, I didn't know if Tim Herndon wasn't USHealth, meaning, I didn't understand

the structure. So we put both of them in there -- or I -- I did when I prepared it. But ultimately, the purpose of this proposal was for Tim Herndon.

Q. And when you say --

A. The agency.

Q. -- for Tim Herndon's agency, I understand.

Did you believe -- were you attempting to enter into an agreement with Mr. Herndon personally or the Herndon agency?

A. The Herndon agency.

Q. If you turn to the second page, it -- it indicates that this was being sent by you, Michael Smoot, is that correct, at the bottom?

A. Yes.

Q. And it says GI -- GSI Global, Inc./Home Technologies, LLC?

A. Yes.

Q. Why is it that you listed both of those companies?

A. I think it had to do with banking. We did not have banking for Home Technologies at the time. We did have banking available for GSI Global, and that's why we ended up ultimately invoicing things through GSI Global and using that company.

Q. Now, at the time this was sent, I believe

Q. Are you aware of him having any income source at all?
A. I'm -- I'm not aware of any, no, but that's...
Q. And by this time period, Cory Mears had had extensive experience in security?
A. Yeah.
Q. And he liked the security business?
A. Oh, yeah.
Q. Had contacts in the security business?
A. Yes.
Q. Had friends in the security business?
A. Yes.
Q. Okay. Had been involved in sub-dealer relationships in the security business?
A. Yes.
Q. Had been involved in telemarketing in the security business?
A. Yes.
Q. And I believe you testified he sent you an e-mail on July 14th, 2015, attaching a security personnel 0713 file. Pardon me. Security Press 1 0713 file, correct?
A. Yes.
Q. And you understood that to be a prerecorded

call for a home security campaign?
A. Yes. When you listen to it, you'll -- you'll see that it's along the similar lines to the recording or the script for the health care. It just flips to security.
Q. So you've personally listened to it?
A. Yes, prior to coming here.
Q. If I play it, would you be able to identify it?
A. I believe so, yeah.
Q. Okay. Give me just a moment. Go ahead.
(Playing recording.)
"Attention home owners. Home burglary is on the rise. Every 11 seconds, a home is broken into. One out of eight of those times, a family is home during the intrusion. Protect your family and property today, and we will pay for your state-of-art equipment and installation. That's right. No money out of pocket. To speak with a live agent, press 1 now. To be deleted from this list, press nine."
Q. Does the audio recording that was just presented to you accurately reflect the content of the recording Mr. Mears has sent to you by e-mail on July 14th, 2015?

A. Yes.
Q. Now, let me ask you a couple questions about that recording. Does that have anything in the world to do with health insurance?
A. No.
Q. Anything in the world to do with the Herndon agency or any companies involved with the Herndon agency?
A. No.
Q. Now, that recording didn't identify a particular security company.
A. That's correct.
Q. Based on your experience in telemarketing for Safe and Sound and as a sub-dealer for multiple other home security dealers, is that the type of recording that could be used to generate home security sales leads for, you know, multiple companies at one time?
A. Yes.
Q. And is that something that, based on your experience, having dealt with Cory Mears, that he certainly had the ability to do?
A. Yes.
Q. I mean, at the time that that recording was sent to you on July 14th, 2015, did Mr. Mears still

have accent -- access to the Voicent Blu Shift system?
A. Yes.
Q. Did Mr. Mears have the knowledge that would be necessary to upload a prerecorded call, like the home security one just presented to you, into that system?
A. Yes.
Q. Did Mr. Mears have the knowledge and ability to initiate a campaign utilizing a home security prerecorded call like the one that was just presented to you?
A. Yes.
Q. Now, at the time this was sent, July 14th, 2015, was that still during the time period that your companies, including the home security company you and Mr. Mears owned together, was it during the time period that those companies had access to the ZM Marketing sales leads subscription?
A. Yeah. It was -- actually, his mom is the one who -- who scrubbed the leads for us and managed the database.
Q. So did Mr. Mears, through his mom or otherwise, have the ability to utilize the system and leads, take the prerecorded call presented to you, prepare a prerecorded call campaign for home security,

and then proceed forth and actually initiate such a campaign?
A. Yes, he could have.
Q. Now, during your direct examination by plaintiff's counsel, he was using a word "speculation." Do you recall that?
A. Yes.
Q. And, now, are you -- are you a lawyer?
A. No.
Q. Okay. Do you know what the legal definition of speculation is?
A. No. I mean...
Q. Have you ever heard the word inference?
A. Yeah, I've heard the word.
Q. Do you know what the legal definition of the word inference is?
A. No.
Q. Well, I believe, you know, you indicated that at this time, it was your belief that Mr. Mears did this, but you weren't sure. Is that a fair assessment?
A. Yeah. That's fair.
MR. MCCUE: Objection.
Q. Okay. Now, can you explain the reasons why you believe Mr. Mears did this?

MR. MCCUE: Objection.

A. Well, I mean, like I said, I know -- I know Cory really well, and he was very -- he -- he really liked the security world. If we would have had the wherewithal, we would have not even moved on to health care. We would have stuck it out with the security. So it -- in knowing his mentality and in knowing his situation, he's -- it -- it seems to be the most likely conclusion.

Q. So let's go through some of that in more detail. First, why would Mr. Mears have sent this recording to you if he wasn't going to use it?

A. I don't know. I can't even recall why he sent it to me, period. I don't know -- you know, it's possible we had some -- some conversations a little bit here and there, but I don't recall any of them. I really don't.

MR. ATHERTON: Let's go ahead and switch the tape.

THE VIDEOGRAPHER: We are going off the record. The time is 6:34.

(Thereupon, a brief recess was had.)

THE VIDEOGRAPHER: We are back on the record. The time is 6:40.

BY MR. ATHERTON:

Q. Mr. Smoot, I'm going to ask -- I'm going to play that security recording one more time.
A. Okay.
Q. And the reason I want to play it back is to see if you can recognize whose voice it is.
A. I can tell you already.
Q. Oh, you can tell me? Who is it?
A. It's Sara. Sara O'Connor.
Q. And who's Sara O'Connor?
A. It was Cory's girlfriend.
Q. Was Sara O'Connor somebody who worked with the companies you and Mr. -- you guys owned together, you and Mr. Mears?
A. Yes.
Q. Okay. Was Sara O'Connor the same person whose voice was used in the health care -- the prerecorded health insurance message?
A. Yes, I believe so.
Q. So would you agree with me that this prerecorded home security message we just played, you know, it wasn't something that some other -- some other company had created. It was created by the companies you and Mr. Mears operated?
A. Yes.
Q. Are you aware of the -- the plaintiff's

calling campaign as an agent of the insurance company, would you -- is that accurate or not?
A. No.
Q. Okay. And do you -- do you believe that there was a million to 800,000 calls made in relation to the arrangement with the Herndon agency? Is that -- do you think that's plausible?
A. No.
Q. This goes on to say, the next sentence, "During this campaign, Mr. Smoot transferred leads to US Advisors." Let's stop there. Did you transfer or your companies transfer leads to USHealth Advisors?
A. The entity, no.
Q. Who were they transferred to?
A. Agents.
Q. And --
A. Licensed independent agents.
Q. That worked under the Herndon agency?
A. That's correct.
Q. In their facility, correct? In the Herndon agency facility, correct?
A. That's correct.
Q. And is it accurate to say that you're not aware of a single call being transferred to Mr. Herndon himself?

business call campaign? Do you agree with that?
A. Yes.
Q. And as far as any of the scripts that you were asked about -- I won't show you the exhibits, unless you want me to. But with respect to scripts that were read or information that was provided to anybody that was called during the call campaign, Mr. Dente's name would have never been referenced; is that correct?
A. No.
Q. Am I --
A. It wouldn't have been mentioned.
Q. At all?
A. At all.
Q. And you have no reason to believe that Mr. Dente ever knew that prerecorded calls were being made during this call campaign; is that correct?
A. Yeah, that's correct. It's the same -- the same situation as before. I didn't really want them to know.
Q. Understood.
MR. BAUMBERGER: No further questions.
MR. BACKMAN: I just have a couple.

CROSS-EXAMINATION

BY MR. BACKMAN:

Q. It seems like decades ago at this point, but at the beginning of your testimony today for Mr. McCue, he asked you what you knew about USHealth Group and USHealth Advisors. Do you remember that?
A. Yes.
Q. You gave him some information. You told him what you knew about USHealth Group and USHealth Advisors, right?
A. Right.
Q. You didn't learn any that of that information until after these GSI calls had been completed, correct?
A. For the -- a lot of the details, I did not know. The USHealth Advisors versus USHealth Group and those kind of things, I didn't know until I became an agent. I -- you know, obviously, I started to learn the differences between the Tim Herndon agency and Don Dente's group and -- and USHealth. But I didn't know the specifics of how they were structured or anything.
Q. Right. And you -- what you learned was that USHealth Advisors and USHealth Group were different corporate structures and entities from the Herndon agency and the Dente agency?
A. Yes.
MR. BACKMAN: Let me mark -- what are we up

to, 25?
MR. ATHERTON: Yes, sir.
(Thereupon, Copy of First Amended Class Action Complaint was received as Defendants' Exhibit 25 for Identification.)
MR. BACKMAN: I only have one copy. It's the First Amended Complaint.
Okay. I have one with my notes, if you want to...
BY MR. BACKMAN:
Q. Mike, I've handed you what we've marked as Exhibit 25. Have you seen that before?
A. I believe I have, yes.
Q. Do you recognize that to be the complaint that was filed by the plaintiff, Trudy Reynolds, in this lawsuit that brings you here today?
A. Yes.
Q. I just want to go through a few of the allegations. If you look at Paragraph 2 for me.
A. Uh-hum. Yes.
Q. In the middle there, it says -- well, let's just read the first sentence as well. "Plaintiff alleges that defendant, Michael Smoot, sent her and other potential class members automated telemarketing calls without her prior expressed consent. Defendant

Smoot did so pursuant to an agreement with USHealth Advisors, LLC." Do you see that?
A. Yes.
Q. That's not true, is it?
A. That is not true.
Q. If you could skip over to page 8 for me. This refers back to the paragraph we just looked at. If you -- if you read it, it says, "Pursuant to that agreement between the parties, USHealth Advisors, Herndon, and Dente hired Defendant Smoot to market USHealth goods and services, which was the goal of the telemarketing campaign engaged in." Do you see that?
A. Yes.
Q. Did I read that accurately?
A. Yes.
Q. Is that a true statement?
A. No.
Q. If you look at Paragraph 51 for me.
A. Yes.
Q. It says, "Following Defendant Herndon and Dente's recommendation, USHealth contracted with Defendant Smoot to increase the volume of its customers." Do you see that?
A. Yes.
Q. Did I read that accurately?

A. Yes.
Q. Is that an accurate statement?
A. No.
Q. From my perspective from a -- for timing, right, we've been talking about these GSI business calls. My understanding, from your testimony today is that's roughly the -- the middle of May through beginning, middle of July; is that accurate?
A. Yeah, I would say so.
Q. And those were calls that were either this B2C Insurance Lead platform, the Avatar platform, or the Blu Shift, Voicent platform, correct?
A. That's correct.
Q. Once you stopped with what we have been calling the GSI calls and your license became effective with USHealth Advisors to sell insurance products, did you ever make a call using an auto dialer with a prerecorded message?
A. No.
Q. If you could look at Paragraph 52 for me, so that's page 9 of that exhibit that I just gave you.
A. Okay.
Q. It says, "Defendant Smoot's strategy for increasing the volume of potentials customers involved the use of ATDS equipment and automated and

prerecorded messages to solicit business." Do you see that?
A. Yes.
Q. Did I read that accurately?
A. Yes.
Q. Now, you have to read that in the context of the prior paragraph that we just read --
A. Uh-hum.
Q. -- where the allegation was that USHealth Advisors hired you to increase the volume of its customers, which you told me was not true, correct?
A. Yes.
Q. So when they refer to Paragraph 52, were you doing that to increase the volume of customers for USHealth?
A. No.
Q. If you could look at Paragraph 54 for me, please. It says, "USHealth is directly liable for the telemarketing calls made by Defendant Smoot because it actively participated in those calls through the guidelines that required Defendant Smoot to follow, including limiting geographically where he could make calls to solicit business." Do you see that?
A. Yes.
Q. Is that statement true?

A. No.
Q. Did USHealth actively participate in the GSI calls that you made?
A. No.
Q. Did GSI provide you with any guidelines that it required you to follow with respect to the GSI call campaign?
A. USHealth?
MR. MCCUE: Jeff, you said GSI.
BY MR. BACKMAN:
Q. Sorry. Did USHealth -- thank you, guys. Did USHealth provide you with any guidelines that it required you to follow in connection with your GSI calls?
A. No.
Q. Did USHealth limit geographically where you could solicit business with respect to the GSI calls?
A. No.
Q. Did US -- well, never mind.
If you could look at Paragraph 55 for me, please. "USHealth knowingly and actively accepted business that originated through the illegal telemarketing calls from Defendant Smoot." Do you see that?
A. Yes.

Q. Is that accurate?
A. No.
Q. If you could look at 56 for me.
A. Uh-huh.
Q. "USHealth maintains interim control over its agents actions, both as to telemarketing and other activities, by directing the content of their agents' advertising, as well as approving the scripts used," period. Do you see that?
A. Yes.
Q. Did USHealth ever approve the scripts that you used for the GSI calls?
A. No.
Q. Did USHealth ever maintain any interim control over GSI's business affairs with respect to the GSI calls?
A. No.
Q. If you would look at 57 for me, please.
A. Uh-hum.
Q. "USHealth knew or reasonably should have known that Defendant Smoot was violating the TCPA on its behalf and failed to take effective steps within its power to force the telemarketer to cease that conduct." Do you see that?
A. Yes.

Q. Did I read that accurately?
A. Yes.
Q. Did USHealth know that you were violating the TCPA?
A. No.
Q. Were you violating the TCPA on behalf of USHealth?
A. No.
Q. Were you making any of the GSI calls on behalf of USHealth?
A. No.
Q. If you would look at 58 for me. It says, "By hiring Defendant Smoot to make" -- "Defendant Smoot to make calls on behalf of its agents to generate new business, USHealth," quote, "manifested assent to another person... that the agent shall act on the principal's behalf and subject to the principal's control, as described in the restatement third of the agency." Do you see that?
A. Yes.
Q. Did I read that accurately?
A. Yes.
Q. Did USHealth hire you to make calls on behalf of -- to generate new business for it?
A. No.

Q. Did USHealth ever manifest assent to you that you have the authority to act on its behalf?
A. No.
Q. And this is all in connection with the GSI calls I'm referring to. You understand that, right?
A. Yes.
Q. Did you consider yourself, while working -- while -- while making these calls through GSI, to be subject to USHealth's control?
A. No.
MR. BACKMAN: I don't have any further questions. Counsel?

REDIRECT EXAMINATION

BY MR. MCCUE:
Q. I really just have one. At the beginning of our discussion, it seems like a long time ago, I asked about your conference call that you had with defense counsel. Do you remember that?
A. Yes.
Q. Okay. And I believe you tell me -- you told me you talked with defense counsel for about 20 minutes. Do you recall that?
A. Yes.
Q. Okay. During that conversation, did this topic of your partner, Cory, using prerecorded calls